UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

UNITED STATES OF AMERICA )
)  1:11-CR-3-001
v. )
)  Chief Judge Curtis L. Collier
GLENN KAMPER )

### SENTENCING MEMORANDUM

On January 26, 2012, the Court held a sentencing hearing for Defendant Glenn Kamper ("Defendant" or "Kamper"). At that hearing, the Court heard argument from Defendant and the government on Defendant's motion for determination of appropriate marijuana-to-MDMA[1] ratio pursuant to *Kimbrough v. United States* (Court File No. 162),[2] and then denied the motion. Given the novelty of the issue,[3] the Court has written this opinion to explain more fully its decision.

---

[1] MDMA is shorthand for methylenedioxymethamphetamine, which is also known as "Ecstasy."

[2] The government filed a written response (Court File No. 167).

[3] Only two district courts have issued written decisions discussing the marijuana-to-MDMA ratio in any detail. *See United States v. Qayyem*, No. 10-cr-19, 2012 WL 92287 (S.D.N.Y. Jan. 11, 2012) (rejecting current 1:500 MDMA-to-marijuana ratio and adopting 1:200 ratio); *United States v. McCarthy*, No. 09-cr-1136, 2011 WL 1991146 (S.D.N.Y. May 19, 2011) (same). Additionally, a district court has declined a habeas petitioner's request to take judicial notice he be resentenced under a different MDMA-to-marijuana ratio because the petitioner's request mischaracterized the *McCarthy* decision. *See Alba v. United States*, No. 09-CV-1789 W, 2012 WL 460322 (S.D. Cal. Feb. 13, 2012). A district court in Washington state considered the issue at sentencing, but ultimately determined it did not need to decide the issue of an appropriate ratio because the prosecution and defense agreed on the proper sentence. Transcript of Sentencing Hearing at 8, *United States v. Phan*, No. CR10-27RSM (W.D. Wash. Mar. 3, 2011). Finally, the United States Court of Appeals for the Tenth Circuit concluded a district court in the District of Utah did not abuse its discretion when it refused to vary from the current 1:500 marijuana-to-MDMA ratio. *United States v. Ferguson*, 447 F. App'x. 898, 902-03 (10th Cir. 2012).

# I.  BACKGROUND

## A.  Defendant's Offense

The government charged Kamper and six codefendants on January 25, 2011 with conspiracy to distribute MDMA in violation of federal law between October 2009 and January 2011 (Court File No. 12).  Kamper was also charged with distribution of MDMA in connection with an event that occurred on January 19, 2011.  On July 19, 2011, Kamper pleaded guilty to the conspiracy count in the indictment pursuant to a plea agreement (Court File No. 108).  In that plea agreement, Kamper stipulated to the following facts:

> Based on information received from confidential informants, agents from the Drug Enforcement Administration ("DEA"), the Federal Bureau of Investigation, and the Chattanooga Police Department investigated a group of individuals responsible for the distribution of 3,4-methlenedioxymethamphetamine, also known as "MDMA" or "ecstasy," a Schedule I controlled substance in the Chattanooga, Tennessee, area. The organization was responsible for the distribution of MDMA, though some evidence also showed that the MDMA was locally produced.

> The defendant entered into an agreement with others to distribute MDMA.

> On November 15 and 17, 2010, a confidential source purchased a total of thirty-five grams of a mixture and substance containing MDMA from the defendant's co-defendants under controls.  On January 19, 2011, DEA executed a search warrant on one of the above co-defendant's residence and located 447.5 grams of a mixture and substance containing MDMA.  Following interviews pursuant to *Miranda* rights waivers, agents identified the defendant as being involved with the MDMA seized as described above.  Agents took statements of co-defendants that the defendant had provided at least ½ ounce of a mixture and substance containing MDMA per month to one of the cooperating co-defendants.  A series of text messages to the defendant prompted the delivery of another ounce of MDMA to the cooperating co-defendant; ultimately, 27.5 grams of a mixture and substance containing MDMA was delivered.

(*Id.* at pp. 2-3).  According to the Presentence Investigation Report ("PSR") prepared on Kamper, the total quantity of MDMA involved in the conspiracy was 1,218.75 grams (PSR, ¶ 22).  Kamper did not object at sentencing to being held responsible for this amount.

2

Prior to sentencing, Kamper filed two motions. First, he moved for a determination of appropriate marijuana-to-MDMA ratio pursuant to *Kimbrough v. United States* (Court File No. 162), to which the government responded (Court File No. 167). Second, Kamper moved for a variance under the factors in 18 U.S.C. § 3553[4] (Court File No. 174); the government filed no response. In this opinion, the Court addresses Kamper's arguments concerning the proper MDMA-to-marijuana ratio.

**B.      MDMA-to-Marijuana Ratio**

Kamper's motion draws on a broader history of the development of the MDMA-to-marijuana ratio under the United States Sentencing Guidelines ("Guidelines" or "USSG"). Before 2001, the Guidelines established one gram of MDMA as equivalent to thirty-five grams of marijuana. United States Sentencing Commission ("Commission"), *Report to Congress: MDMA Drug Offenses, Explanation of Recent Guideline Amendments* 6 (2001) ("MDMA Report"). In 2000, however, Congress passed the Ecstasy Anti–Proliferation Act, which directed the Commission to review and increase penalties for any offense relating to the manufacture and trafficking of MDMA, and required the Commission to submit a report on the resulting amendments to Congress. Pub.L. No. 106–310, 114 Stat. 1101, 1241–45. The MDMA Report followed.

To comply with the Congressional directive, the Commission sought input from a wide range of participants. First, the Commission "began reviewing the available scientific and popular literature on MDMA," and involved the Department of Justice in this process. MDMA Report, p. 3. Second, the Commission heard from DEA officials regarding the trafficking pattern of MDMA

---

[4] In fact, Kamper used this motion to explain his objections to the PSR, to reemphasize his arguments for a different MDMA-to-marijuana ratio, and to argue for a non-Guidelines sentence under 18 U.S.C. § 3553.

and law enforcement challenges associated with the drug. Third, the Commission invited representatives from the National Institute on Drug Abuse ("NIDA") to talk about the health and pharmacological effects associated with MDMA. Moreover, the Commission sought considerable public input. It delayed a vote on the MDMA amendment until after it held its annual public meeting. Additionally, it received "literally hundreds of letters, e-mails, and other written submissions . . . from a diverse array of constituents, including clinicians, physicians, psychologists, academic researchers, users, defense attorneys, and other interest groups." *Id.* at 4.

Having considered input from this wide array of sources, the Commission concluded penalties for MDMA offenses should be more severe than for powder cocaine, which has a 200:1 marijuana equivalency, but less severe than for heroin, which has a 1000:1 marijuana equivalency. *Id.* at 5. The Commission decided on less severe sentences for MDMA offenses than for heroin because:

> (1) there are many more heroin cases in the federal system than MDMA cases, (2) heroin is more addictive than MDMA, (3) heroin has many more emergency room visits and deaths associated with its use than MDMA because, unlike MDMA which generally is taken orally, heroin is injected, (4) heroin has more violence associated with both its users and distribution system than MDMA, in part because MDMA users typically do not resort to violence to support their drug use, and (5) heroin causes greater secondary health effects, such as the spread of HIV and hepatitis, because it is injected.

*Id.* The Commission then offered three reasons for imposing higher sentences for MDMA offenses than for powder cocaine: "(1) unlike MDMA, powder cocaine is not neurotoxic, (2) powder cocaine is not aggressively marketed to youth in the same manner as MDMA, and (3) powder cocaine is only a stimulant, but MDMA acts as both a stimulant and a hallucinogen." *Id.* The Commission ultimately established an MDMA-to-marijuana equivalency ratio of 1:500 grams. *Id.*

4

## II.     DISCUSSION

Kamper asks this Court to categorically reject the current 1:500 MDMA-to-marijuana ratio under the Guidelines and replace it with a lower one.  In making this request, Kamper in essence asks the Court to step into the shoes of Congress and the Commission and legislate a change to the drug equivalency table under the Guidelines.  Were the Court to take this step, it would reach beyond the bounds of the Constitution's vesting of the "judicial Power of the United States" in the federal judicial branch.  U.S. Const. art III, § 1.  In upholding the constitutionality of the Sentencing Commission against a separation of powers challenge, the Supreme Court observed "because Congress vested the power to promulgate sentencing guidelines in an independent agency, *not a court*, there can be no serious argument that Congress combined legislative and judicial power within the Judicial Branch." *Mistretta v. United States*, 488 U.S. 361, 394 (1989) (emphasis added). Although  *United States v. Booker*, 543 U.S. 220 (2005), rendered the Guidelines advisory, neither that decision nor its progeny permits a federal court to extend the Article III judicial power to include the legislative and rulemaking powers vested in Congress, and through Congressional delegation, in the Commission.  Because the Court cannot take on the powers of Congress and the Commission to establish sentencing policy, and because the Court would refrain from doing so in this case for institutional reasons even if it could assume such powers, the Court denied Kamper's motion.

### A.     Sentencing Methodology and *Kimbrough v. United States*

Shortly after the United States Supreme Court held the Guidelines advisory in *Booker*, this Court announced the methodology under which it would impose sentence on a criminal defendant. *United States v. Phelps*, 366 F. Supp. 2d 580 (E.D. Tenn. 2005).  The Court further explained this

methodology in *United States v. McElheney*, 630 F.Supp.2d 886 (E.D. Tenn. 2009), and most recently, in *United States v. Rothwell*, — F.Supp.2d —, No. 1:11-CR-72, 2012 WL 953705 (E.D. Tenn. Mar. 21, 2012). In brief, the Court follows a three-step process. First, after resolving any objections to the PSR or any outstanding factual or legal disputes related to a defendant's criminal history or offense of conviction, the Court determines the proper advisory Guidelines range. *Gall v. United States*, 552 U.S. 38, 49 (2007) ("[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. . . .") (citing *Rita v. United States*, 551 U.S. 338 (2007)); *see also United States v. Bistline*, 665 F.3d 758, 761 (6th Cir. 2012) ("Although the Sentencing Guidelines are now only advisory, they still 'should be the starting point and the initial benchmark' for choosing a defendant's sentence.") (quoting *Gall*, 552 U.S. at 49). Second, after determining whether, pursuant to the USSG Manual, any departures from the advisory Guideline range apply, USSG ch. 5, pt. K; *Phelps*, 366 F. Supp. at 586, the Court considers whether a departure from the advisory Guideline range is warranted. This second step can also be seen as extension of the first step because "[o]nly after a court has correctly departed upward or downward (if it departs at all) from the initial Guideline range has the court determined the proper advisory Guideline range for sentencing purposes." *Rothwell*, 2012 WL 953705, at *5. Finally, taking account of the panoply of considerations under 18 U.S.C. § 3553, the Court imposes an appropriate sentence. When selecting a sentence in this third and final step, the Court conducts an "individualized assessment based on the facts presented," *Gall*, 552 U.S. at 50, and may then either impose a sentence within the applicable Guideline range (after any clearly applicable departures) if such is consistent with the court's consideration of the § 3553(a) factors, or impose a non-Guideline sentence if such is justified by the § 3553(a) factors, *see United States v. Vonner*, 516 F.3d

6

382, 387 (6th Cir. 2008) (en banc).

When determining a sentence in this final step, the Court's ultimate objective is to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2). In achieving these purposes, an appropriate consideration for drug trafficking cases under § 3553 is the empirical validity of a policy supporting the drug equivalency table[5] used in the Guidelines. *Kimbrough v. United States*, 552 U.S. 85, 108-09 (2007). In *Kimbrough*, the Supreme Court upheld a district court judge's policy disagreement with the 100:1 crack-to-powder cocaine ratio, noting both the Commission did not employ its typical empirical approach in formulating the Guideline for drug trafficking offenses, *id.* at 96, and the Commission's own efforts to have the ratio changed, *id.* at 110 ("Indeed, the Commission itself has reported that the crack/powder disparity produces disproportionately harsh sanctions, i.e., sentences for crack cocaine offenses 'greater than necessary' in light of the purposes of sentencing set forth in § 3553(a)."). Although the Supreme Court also appeared to ground its approval of the district court's sentence in part on the fact "the court did not purport to establish a ratio of its own," *id.* at 111, the Supreme Court later clarified the power to reject the crack-to-powder ratio includes the power to establish a new one, *Spears v. United States*, 555 U.S. 261, 265 (2009) ("Put simply, the ability to reduce a mine-run defendant's sentence necessarily permits adoption of a replacement ratio."). Indeed, a district court that categorically rejects a drug ratio but masks its categorical disagreement as a series of "individualized determinations" would be engaging in "institutionalized subterfuge." *Id.* at 266. Thus, where a district court categorically rejects a drug equivalency ratio, it should also adopt a new ratio. This is precisely what Kamper asks this Court to do with the MDMA-to-marijuana ratio.

_____

[5] The drug equivalency table can be found at USSG § 2D1.1, Application Note 10(D).

7

**B.** *McCarthy v. United States*, No. 09-cr-1136, 2011 WL 1991146 (S.D.N.Y. May 19, 2011)

In May 2011, faced with the same issue currently before this Court, Judge William H. Pauley III became the first federal judge to reject the current 1:500 MDMA-to-marijuana ratio found in the Guidelines. *See McCarthy*, 2011 WL 1991146, at *1. Both sides in *McCarthy* offered two expert witnesses who were subject to direct and cross examination, as well as extensive questioning from Judge Pauley. Kamper has submitted the entire 400-page transcript from the two-day evidentiary hearing, and the Court has reviewed it. After permitting each side to submit briefs after the hearing, Judge Pauley issued a nine-page memorandum in May 2011. The court reviewed the scientific and other evidence offered during the two-day hearing, and rejected both McCarthy's position that the proper MDMA-to-marijuana ratio was either 1:1 or 1:35 and the government's position that the current 1:500 ratio was appropriate.

Considering the three factors on which the Sentencing Commission primarily relied in concluding MDMA was more harmful than cocaine—that: 1) MDMA is neurotoxic while cocaine is not; 2) MDMA is aggressively marketed to youth while cocaine is not; and 3) cocaine is only a stimulant, but MDMA acts as both a stimulant and a hallucinogen—the court found these bases no longer entirely supportable, but also not entirely repudiated. Expert opinion differed on whether MDMA is in fact neurotoxic or not. Second, although prevalence of MDMA usage has significantly decreased since the early 2000s, the court found MDMA was indeed uniquely marketed to the younger population. Finally, the court noted "the Commission's statement that cocaine is only a stimulant, while MDMA is both a stimulant and a hallucinogen, is without factual support and largely irrelevant." *Id.* at *3.

8

While Judge Pauley noted MDMA's "significant negative impacts," he nonetheless concluded "the Commission's analysis of these impacts—particularly as compared to cocaine—was selective and incomplete." *Id.* The court noted cocaine is responsible for more emergency room visits than MDMA (even taking into account greater overall usage of cocaine), cocaine is more addictive than MDMA,[6] and cocaine trafficking is responsible for more violence than MDMA trafficking. *Id.* at *3-4. The court, noting "the Commission's analysis focused on the few ways in which MDMA is *more* harmful than cocaine, while disregarding several significant factors suggesting that it is in fact *less* harmful," described this as "opportunistic rummaging." *Id.* at *4 (emphasis in original).

Ultimately, the court concluded 1:200—the same ratio used for cocaine-to-marijuana—was the appropriate MDMA-to-marijuana ratio. Although the court found the scientific and other evidence indicated several ways in which MDMA was less harmful than cocaine, the court was cognizant that "MDMA also presents in own unique dangers." *Id.* In a footnote, the court observed "much of the evidence indicates that MDMA is less harmful than cocaine, suggesting that an even lower equivalency may be appropriate given a sufficient factual foundation in a later case." *Id.* at *4 n.2.

### C.    Arguments by the Parties

In both their written submissions and orally at the sentencing hearing, Kamper and the government advanced a number of arguments. Kamper filed a 25-page motion urging the Court to reject the current MDMA-to-marijuana ratio of 1:500, and instead use a ratio of 1:1, or, in the

---

[6] There is scientific dispute regarding whether MDMA is an addictive drug at all.

9

alternative, return to the 1:35 ratio in place prior to the Commission's 2001 amendment to the current ratio. The government advocated the Court retain the current 1:500 MDMA-to marijuana ratio.

Most of the arguments Kamper offers are drawn directly from the evidence reviewed by Judge Pauley in the *McCarthy* evidentiary hearing. First, Kamper contends the current MDMA-to-marijuana ratio lacks an empirical basis because it relies on now-discredited science. Specifically, he asserts the Commission's MDMA Report based its scientific findings on studies rife with methodological errors, including inadequate controls, inappropriate dosage levels,[7] non-replicable studies, dubious assumptions, and overstatements of MDMA's actual harm. Second, Kamper argues the non-scientific justification for the increase in the MDMA-to-marijuana ratio—fear of particular harm to youth—has not been borne out. Third, Kamper offers a slew of arguments suggesting in fact cocaine is more harmful than MDMA, relying on medical data, and expert opinion. Fourth, Defendant argues MDMA is not more harmful than marijuana. Kamper's brief concludes by comparing cocaine, marijuana, and MDMA under the five-factor test[8] articulated by the Commission when weighing MDMA against heroin, and arguing that MDMA is less harmful than the other two drugs.

_____

[7] At the time of the MDMA Report in 2001, studies performed were almost entirely on animals, and used dosage levels far above what human MDMA users would ever ingest. More recent studies recalibrating dosage levels have largely discredited the earlier studies, particularly as related to neurotoxicity findings. *See* Bauman et al., *3,4 Methylenedioxymethamphetamine (MDMA) Neurotoxicity in Rats: A Reappraisal of Past and Present*, 189 PSYCHOPHARMACOLOGY 407, 411 (2007).

[8] The five factors were: 1) number of cases in the federal system; 2) addiction potential; 3) emergency room visits; 4) violence associated with use and distribution; and 5) secondary health effects. MDMA Report, p. 5.

10

The government opposes Kamper's motion. Although the government seeks to discredit both Kamper's arguments and the *McCarthy* decision, it devotes most of its brief to attacking the latter. Indeed, the government in its written submission does not offer a significant challenge to the scientific evidence—most, although not all, of which suggests the Commission relied on faulty MDMA studies—cited by Kamper.[9] The government first claims "*McCarthy* has not been adopted by any other court in the almost eight months since its decision" (Court File No. 167, p. 9).[10] The government next asserts Kamper and the *McCarthy* court's focus on science fails to appreciate that the Commission, in its MDMA Report, also indicated concerns about increased importation, internet marketing, and the need to fashion a multi-part response. Third, the government contends the

> Commission is in a much better position than a single judge to obtain the full scope and breadth of current medical science and societal norms on particular controlled substances and receive all appropriate relevant information from the health, law enforcement, and educational communities concerning the impact and the threat of a particular drug to our families, communities, and nation (Court File No. 167, p. 9).[11]

---

[9] At the sentencing hearing, the government emphasized two scientific arguments. It twice called attention to the fact MDMA is both a stimulant and a hallucinogen. In light of considerable scientific agreement this claim is "without factual support and largely irrelevant," *McCarthy*, 2011 WL 1991146, at *3, the government's decision to underscore this point is puzzling. Second, the government pointed out the average marijuana-to-hallucinogen ratio under the drug equivalency table in USSG § 2D1.1 for the twenty-two proscribed hallucinogens is 1:965, and the most frequently used ratio (i.e., the mode) is 1:500. Given this treatment under the Guidelines for other hallucinogens, the government contended, the 1:500 marijuana-to-MDMA ration is appropriate.

[10] This argument is flawed and somewhat misleading. It is flawed because it is incorrect: a decision issued three days before the government filed its motion in this case adopted the 1:200 MDMA-to-marijuana ratio, and endorsed *McCarthy*. *See United States v. Qayyem*, No. 10-cr-19, 2012 WL 92287 (S.D.N.Y. Jan. 11, 2012) (Wood, J.). It is misleading because although *Qayyem* appears to be the first court to adopt *McCarthy*, no court has explicitly rejected *McCarthy* either, at least not in a written decision. Thus, it is likely that other courts have mostly not addressed this issue yet.

[11] Despite only making this argument in a single sentence in its brief, the government placed considerable emphasis on this argument during the sentencing hearing.

Finally, the government reminds the Court under *Kimbrough*, "the fact that a district court *may* disagree with a Guideline for policy reasons and *may* reject the Guidelines range because of that disagreement does not mean that the court *must* disagree with that Guideline or that it *must* reject the Guidelines range if it disagrees." *United States v. Brooks*, 628 F.3d 791, 800 (6th Cir. 2011) (emphasis in original).

### D.    Legislative v. Adjudicative Power

Although sympathetic to Kamper's underlying claim that the scientific support justifying the current 1:500 MDMA-to-marijuana ratio has eroded significantly since the Commission adopted it in 2001, the Court declined his invitation at sentencing to follow Judge Pauley in *McCarthy* by categorically rejecting that ratio and categorically adopting its own.  The Court did so because it understands its primary responsibility to be the exercise of judicial power under Article III of the Constitution through adjudication of the cases before it, which does not generally include a freestanding power to legislate sentencing policy or promulgate amendments to the Guidelines.  *See Mistretta*, 488 U.S. at 394-95.  While federal district courts judges must in every sentencing case consider the application of various Guideline provisions to an individual defendant, and in some instances exercise their Constitutional prerogative not to follow a given provision, neither the Constitution nor Congress has authorized district court judges to engage in the rulemaking process to legislate new Guideline provisions.[12]  Unlike Congress, which is accountable to the People, and

---

[12] In a footnote in *Mistretta*, the Supreme Court noted it "express[ed] no opinion whether, under the principles of separation of power, Congress may confer on a court a rulemaking authority such as that exercised by the Sentencing Commission."  *Mistretta*, 488 U.S. at 394 n. 20.  The Supreme Court acknowledged the conferral of rulemaking power on the courts, as opposed to the Commission, would involve a different "constitutional calculus."  *Id.*  Whether constitutional or not, the fact remains Congress has not delegated to individual district court judges the rulemaking power

12

the Commission, which is in turn "fully accountable to Congress," *id.* at 394, the courts operate independently of popular control. While this insulation from the political process is fundamental to ensuring judicial independence and the rule of law, it also implies the judicial branch refrain from engaging in the legislative and rulemaking powers vested elsewhere. Thus, this Court questions whether endowing district court judges with the general power to engage in rulemaking in the sentencing context would run afoul of the important structural principle in our Constitution that separates legislative and adjudicative functions.

*Kimbrough* did not alter this fundamental structural principle. Read broadly, *Kimbrough* authorizes a federal district court judge to reject a policy judgment by the Commission. Even this broad reading, however, is consistent with the long-standing power of the courts to strike down a law. *See Marbury v. Madison*, 5 U.S. 137 (1803) (establishing judicial review of legislative acts). The harder question, not answered until *Spears*, was whether a court could affirmatively legislate a new crack-to-powder ratio. *Spears* provides courts with the incidental power to replace a categorically rejected ratio for the purpose of correctly calculating a defendant's Guideline range. Thus, under *Kimbrough* and *Spears*, a court must not only decide to categorically reject a ratio, it must also categorically adopt a new one.[13] It is not clear to the Court this broad reject-and-replace power does (or should) exist outside the universe of crack-to-powder ratio cases. *See United States v. Vandewege*, 561 F.3d 608, 610 (6th Cir.2009) (Gibbons, J., concurring) ("Neither *Kimbrough* nor

_____

delegated to the Commission.

[13] Determining–that is, in essence legislating–a replacement ratio would be less daunting, where, as with the crack-to-powder ratio, the Commission had proposed a specific alternate ratio. *See Kimbrough*, 552 U.S. at 99 (noting Commission had suggested 20:1 ratio). As the Court discusses *infra*, the Commission has offered no suggestions for an alternate MDMA-to-marijuana ratio.

13

*Spears* authorized district courts to categorically reject the policy judgments of the Sentencing Commission in areas outside of crack-cocaine offenses"); *but see Bistline*, 665 F.3d at 763-64 (construing *Kimbrough* to permit–but ultimately rejecting–a district court's policy challenge to the child pornography Guideline).

Instead of the reject-and-replace approach Kamper advocates, this Court will apply its three-step sentencing process in a manner consistent with its role as an adjudicative–not a legislative–entity. Rather than invalidate the MDMA-to-marijuana ratio at the outset, and thus be forced to legislate a new ratio, the Court will rely on the challenged 1:500 ratio in calculating the advisory Guideline range. At the third and final step, the Court will then determine whether the Guideline range resulting from use of the challenged ratio yields a sentence consistent with the purposes of 18 U.S.C. § 3553. If so, the Court will impose a Guideline sentence; if not, the Court will vary outside the Guidelines. This approach allows the Court to properly perform an "individualized assessment" of each MDMA defendant, *see Gall*, 552 U.S. at 50, and produces the important corollary that the evidence and advocacy put forward by one MDMA defendant (or government prosecutor) will not prospectively bind all future MDMA defendants.

Moreover, this approach does not amount to "institutionalized subterfuge." *Spears*, 555 U.S. at 266. The Supreme Court in *Spears* wanted to avoid a situation where a district court judge categorically disagrees with a Guideline but instead of forthrightly expressing that disagreement, couched its disagreement in terms of an "individualized assessment" that conveniently always produced a non-Guideline variance. Such an approach would be deeply flawed because it would not alert the Commission to the policy disagreement and the perceived underlying problem with the Guideline provision, would not allow for sentencing transparency, would not permit proper appellate

14

review, and would be at heart dishonest. This concern does not apply here, however, because the Court has no categorical disagreement with the MDMA-to-marijuana ratio. Thus, while the Court may find reason to vary outside the advisory Guideline range for some MDMA defendants, it may well sentence within the Guideline range for others.[14] The § 3553 factors applied to the facts of an individual defendant's case will ultimately determine an appropriate sentence, where the strength of the empirical support for the MDMA-to-marijuana ratio will be one among many of the § 3553 considerations.

Finally, the process described above avoids a troubling administrative problem inherent in Kamper's reject-and-replace approach. Federal law provides for 677 district court judgeships. *See* 28 U.S.C. § 133. Under Kamper's approach, every single one of these judges could reject the MDMA-to-marijuana ratio under the Guidelines and replace that ratio. There could then theoretically be 677 different MDMA-to-marijuana ratios: one judge may decide to keep 1:500; another judge would determine 1:200 is appropriate; a third judge would set the ratio at 1:32.5; and so on. This approach would almost certainly produce the kind of unwarranted sentencing disparities § 3553 attempts to avoid. *See* § 3553(a)(7). A sentence for an MDMA defendant would be based not on the facts and law of each case, but on the ratio employed by the particular sentencing judge, where even different judges in the same courthouse could rely on different ratios. In the face of such a haphazard process, the public would rightfully lose respect for the courts.

_____

[14] Indeed, in sentencing Kamper and three of his codefendants charged with the same offense, the Court imposed one below-Guideline sentence, one above-Guideline sentence, and two sentences within the Guideline range.

Thus, the Court concludes its role as an adjudicative body counsels in favor of denying Kamper's motion to categorically reject the MDMA-to-marijuana ratio and legislate a new one. The authority under *Kimbrough* and *Spears* to reject and adopt a Guideline provision on policy grounds is best limited to the unique situation at issue in the crack-to-powder ratio cases. *See Vandewege*, 561 F.3d at 610-11. To the extent these cases can be read to support a broader power for sentencing courts to deputize themselves as sentencing Commissioners, the Court concludes there are strong institutional reasons for not exercising that power in this case.

### E.    Institutional Considerations

Even if *Kimbrough* and *Spears* permit a district court judge to reject a drug equivalency ratio in USSG § 2D1.1 on policy grounds and substitute a new ratio for the rejected one, the Court would not exercise that power here. As a general matter, these cases do not invite district court judges to use this power lightly. *See also Bistline*, 665 F.3d at 764 ("[W]hen a guideline comes bristling with Congress's own empirical and value judgments—or even just value judgments—the district court that seeks to disagree with the guideline on policy grounds faces a considerably more formidable task than the district court did in *Kimbrough*.").[15] Here, the Court would not reject the current MDMA-to-marijuana ratio and adopt a new ratio because it concludes, as the government argues, the Commission is in a better position than the Court to take into account all necessary empirical research and relevant value judgments to formulate a proper MDMA-to-marijuana ratio. In brief, to the extent the MDMA-to-marijuana ratio should be studied and perhaps revised, the Commission–and neither this Court nor any other individual district court–should lead this effort.

---

[15] Although the *Bistline* court was discussing USSG § 2G2.2 (child pornography) and not USSG § 2D1.1 (drug trafficking), the Court notes the Commission increased the MDMA-to-marijuana in response to a Congressional directive.

16

The Court's recognition of the institutional strengths (and limitations) of Congress and the Commission as measured against its own is not a new point. Shortly after *Booker* rendered the Guidelines advisory, this Court acknowledged "it is neither the purpose nor the province of the federal judiciary to gather evidence, hear testimony, and come to conclusions" about certain matters within the sentencing context. *Phelps*, 366 F.Supp.2d at 588. Simply put, the Court is not equipped to undertake the type of research and inquiry required to make an informed judgment about the scientific and other evidence at issue in determining a proper MDMA-to-marijuana ratio. Congress established the Commission to engage first in detailed factfinding and then to promulgate the Guidelines as part of its rulemaking power. *Mistretta*, 488 U.S. at 394-95 (noting the Congress "vested the power to promulgate sentencing guidelines in an independent agency, not a court," and that the Commission wields "rulemaking power and not the adjudicatory power exercised by individual judges when passing sentences"). Although *Booker* makes clear individual courts have the power to reject the Guidelines, neither *Booker* nor its progeny unsettles the structural commitment of the Commission as the leading policymaker on national sentencing issues implicating empirical questions. *Kimbrough*, 552 U.S. at 108-09 ("Carrying out its charge, the Commission fills an important institutional role: It has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise.'") (quoting *United States v. Pruitt*, 502 F.3d 1154, 1171 (10th Cir. 2007) (McConnell, J., concurring)). Because determination of a proper MDMA-to-marijuana ratio under the Guidelines is a national question and implicates empirical research, the Court believes the Commission and its staff is far better suited to conduct the necessary factfinding. Indeed, Judge Pauley's yeoman efforts notwithstanding, an individual federal district court judge simply cannot

17

marshal resources akin to those available to the Commission for tackling the manifold issues involved with determining a proper drug equivalency.[16]

The Commission and Congress are better placed to determine the appropriate MDMA-to-marijuana ratio not only because such an inquiry involves empirical questions of national magnitude, but also because such a determination requires value judgments concerning the relative harm of a controlled substance. This Court has expressed particular reticence about second-guessing the gradations in punishment reflected in Congressional judgments that

> certain drugs present a more pernicious danger to society and should be punished more harshly. Because Congress is in an infinitely better position to make such determinations, the Court will defer to the Guidelines and decline to impose a non-Guideline sentence based upon arguments as to the subjective seriousness of one drug relative to another.

*Phelps*, 366 F.Supp.2d at 589. As counsel for Kamper admitted at the sentencing hearing, the relative harm caused by MDMA–as compared to marijuana, cocaine, heroin, or any other controlled substance–is a subjective inquiry. Determining the harmfulness of a given controlled substance will depend on when and to what extent the effects of a substance are felt by a given individual, how long those effects last, whether the long-term or short-term effects prove more (or less) pernicious, and how to calibrate these and other inquiries into a series of metrics. By its nature, the question

---

[16] In an overview document available on the Commission's website, the Commission describes one of its three principal purposes as "to collect, analyze, research, and distribute a broad array of information on federal crime and sentencing issues, serving as an information resource for Congress, the executive branch, the courts, criminal justice practitioners, the academic community, and the public." United States Sentencing Commission, *An Overview of the United States Sentencing Commission*. The Commission further clarifies it accomplishes this objective by "establishing a research and development program on sentencing issues." *Id.* Indeed, one of the Commission's departments is specifically committed to Research and Data. This Court has no analogous resources to draw on.

18

of harm involves non-scientific value judgments, and the Court concludes such judgments at a systematic level are best left to Congress and the Commission.  *Cf. Bistline*, 665 F.3d at 764.

In asking this Court to reject the current 1:500 MDMA-to-marijuana ratio in favor of a lower one, Kamper relies heavily on *Kimbrough v. United States*.[17]  Even if the Court possesses the authority under *Kimbrough* and *Spears* to categorically reject a drug ratio and adopt a new one, the MDMA-to-marijuana ratio at issue here differs in two important respects from the crack-to-powder disparity question before the Supreme Court in *Kimbrough*.  First, there is little indication the Commission took account of any empirical data or national experience when setting the crack-to-powder ratio.  *Kimbrough*, 552 U.S. at 109-10.  By contrast, the Commission sought input from a number of sources, including leading scientists in the field, when it amended the MDMA-to-marijuana ratio in 2001.  *See generally* MDMA Report 7-10 (discussing then-current scientific research on health hazards of MDMA).  It may well be, as Kamper argues and as the thick binder of scientific articles Kamper submitted suggests, that current science has largely displaced the findings on MDMA available in 2001.  But the uncontroversial fact that scientific thinking on a given subject evolves does not render the Commission's reliance on then-current science in 2001 devoid of empirical support.  If the science has changed significantly, the Commission should review the science to determine whether or not it continues to provide the empirical support it did in 2001.  As noted, the Commission and its staff is eminently better positioned to assess the empirical validity of the science underlying the health hazards of MDMA than this Court.

---

[17] Indeed, Kamper styles his motion as a request for the Court to determine an "appropriate marijuana-to-MDMA ratio pursuant to *Kimbrough v. United States*" (Court File No. 162).

19

Second, the Commission itself had come to the conclusion the crack-to-powder ratio should be amended, and had then long–but unsuccessfully–sought to have that ratio decreased. Indeed, in multiple reports spanning a number of years, the Commission criticized the crack-to-powder disparity as unwarranted. *Kimbrough*, 552 U.S. at 97-98. With regard to the MDMA-to-marijuana ratio, the Commission does not appear to have studied the issue, nor been asked to, since producing the MDMA Report in 2001. Thus, when Judge Jackson in *Kimbrough* rejected the crack-to-powder ratio, his policy disagreement squared with the Commission's own research and recommendations. Here, by contrast, a judge can find no support in the Commission's work to reject the MDMA-to-marijuana ratio. While this fact alone does not constrain a district court from rejecting the ratio, the absence of any significant study of this issue by the Commission since 2001 counsels caution.

The absence of significant study of a proper MDMA-to-marijuana ratio poses an additional challenge. Enabling the Commission's conclusion that the crack-to-powder disparity under the Guidelines was unwarranted was, *inter alia*, extensive statistical analysis the Commission performs on a quarterly basis. The Commission's statistical work is invaluable to district court judges. Indeed, statistical analysis of variances granted in child pornography cases has helped this Court determine the proper amount of deference owed to USSG § 2G2.2. *See McElheney*, 630 F.Supp.2d at 894-95 (relying on Commission statistics to determine "the Guidelines are no longer descriptive of national sentencing practices when more then half of all child pornography defendants are being sentenced outside the advisory Guidelines range"). At the sentencing hearing, neither counsel for Kamper nor the government were able to produce statistics on non-Guideline sentences under USSG § 2D1.1 for offenses involving MDMA. If, as with child pornography, courts were imposing non-

20

Guideline sentences on MDMA defendants in more than fifty percent of cases,[18] this statistic would support Kamper's argument. In fact, the Commission does not appear to have made available statistics for MDMA sentences. Although the Commission tracks sentences imposed under USSG § 2D1.1 by drug, it does not specifically break out MDMA sentences.[19] Without this statistical information, the Court lacks an important metric–a measure of the sentencing practices of other federal judges dealing with this issue.[20]

Thus, in the face of considerable uncertainty about both the science and policies underlying the MDMA-to-marijuana ratio and the sentencing practices of federal district courts in MDMA cases, and lacking the Commission's resources to untangle this uncertainty, the Court, even assuming it had the power to legislate a new MDMA-to-marijuana ratio, must decline Kamper's invitation to do so.

## III. CONCLUSION

For the reasons discussed above, the Court denied Defendant's motion for determination of appropriate marijuana-to-MDMA ratio pursuant to *Kimbrough v. United States* (Court File No. 162).

-------------------------------------------------

[18] More recent statistics indicate federal courts impose non-Guideline sentences in more than sixty percent of child pornography cases. *Rothwell*, 2012 WL 953705, at *1 n.1.

[19] The Commission reports on sentences imposed for powder cocaine, crack cocaine, heroin, marijuana, methamphetamine, and "other." *See* United States Sentencing Commission, *Preliminary Quarterly Data Report* 38, 40 (2012) . The same is true for Commission data reports ranging back to 2006.

[20] The Court notes the government recently submitted a response brief in another MDMA case in which it claimed the fact only 20.3% of offenders in MDMA-related drug crimes received a non-government-sponsored below-Guideline sentence in 2008 and only 28.5% in 2009 indicates the reliability of the current 1:500 MDMA-to-marijuana ratio. Gov't Response to Motion for Variance, *United States v. Park*, No. 11-Cr-3-004 (Court File No. 218, pp. 4-5). Having reviewed the government's cited source, however, the Court was unable to find either statistic.

21

**/s/**_____
**CURTIS L. COLLIER**
**CHIEF UNITED STATES DISTRICT JUDGE**

22